**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EBELE IKEZOGWO,**<br>           **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **OMOLADE ADEBOWALE FATIREGUN,**<br>        **Defendant.** | **NO.  24-5672** |

<u>**MEMORANDUM**</u>

**Hodge, J.**                                                                              **January 3, 2025**

Before the Court is Petitioner Ebele Ikezogwo's ("Petitioner" or "Ikezogwo") Petition for Return of Child to the United Kingdom (ECF No. 1), under the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001, *et seq.* ("ICARA"), which implements the Hague Convention on the Civil Aspects of International Child Abduction, The Hague on Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (the "Convention"). Petitioner seeks the return of her minor son, O.I.F. age 11, who she alleges is being unlawfully retained in the United States by Respondent Omalade Fatiregun ("Respondent" or "Fatiregun"). Respondent is O.I.F.'s father and Petitioner's husband. The Court has carefully considered the parties' submissions and the evidence presented at the evidentiary hearing on December 16, 2024. For the reasons that follow, the Petition is granted, and it is ordered that O.I.F. be returned to Petitioner in the United Kingdom.

## I.    BACKGROUND[1]

### A.  Procedural History

On October 24, 2024, Petitioner filed her Petition for Return of Child against Respondent, and a Petition for Immediate Issuance of Show Cause Order. (*See* ECF Nos. 1, 2.) The Court set

---

[1]        The Court adopts the pagination supplied by the CM/ECF docketing system.

the date for an initial hearing on November 4, 2024 and ordered Respondent to appear with O.I.F. (ECF No. 5.) Respondent failed to appear at the initial hearing, but did appear at the Courthouse later that same day, received personal service of the Court's order and agreed to appear with the child on November 12, 2024. (ECF No. 8.)

Due to Respondent's failure to appear at the initial hearing, during that initial hearing the Court encouraged Petitioner to travel to the United States from the United Kingdom, so that she would be available to care for O.I.F. in the event that Respondent did not appear on November 12, 2024. All parties did appear before the Court on November 12, 2024. During that hearing, the Court had an *in camera* conversation with O.I.F., during which the Court was able to ascertain that the child's needs were being met, he was attending school and was safe. The Court scheduled an evidentiary hearing for November 22, 2024 (ECF No. 10), which was continued twice to give Respondent additional time to try and secure counsel. (ECF Nos. 13, 16.) After providing the Respondent additional time to do so, Respondent was not able to hire an attorney and proceeded in this matter *pro se*. Respondent was ordered to respond to the Petition in advance of the hearing, which he did. (*See* ECF No. 17.)

On December 16, 2024, the Court conducted an evidentiary hearing, during which it heard testimony from Petitioner and Respondent and reviewed exhibits submitted during and following the hearing.[2]

### B.  Findings of Fact

Generally, many of the events that led to these proceedings are undisputed. Petitioner and Respondent were married in 2011, and their son, O.I.F. was born in Washington, D.C. in 2013. (ECF No. 1-5 at 7; ECF No. 17 at 3.) They lived in the United States until Respondent was offered

---

[2]    Follow the evidentiary hearing, the Court gave the parties until December 20, 2024 to submit additional exhibits. (*See* ECF No. 19.)

a position in Rome, Italy, where they lived for several years. (ECF No. 17 at 3-4.) In 2017, the family moved to Dakar, Senegal for Petitioner's work with the World Bank Group. (ECF No. 1-5 at 7.) In 2021, the Respondent contracted a severe case of COVID-19, which resulted in emergency medical evacuation from Senegal to Accra, Ghana, and then to Berlin, Germany. (ECF No. 1-5 at 7; ECF No. 17 at 4.) Respondent was in a medically-induced coma for several months. (ECF No. 1-5 at 7.) Petitioner and O.I.F. traveled to Berlin while Respondent was in the hospital, however, in September 2021, while Respondent was still unresponsive in the hospital, Petitioner decided to move with O.I.F. to the United Kingdom. (*Id.*) Both Petitioner and Respondent have family in the United Kingdom, and Respondent and O.I.F. both hold U.K. citizenship. (ECF No. 17 at 4.) Upon arriving in the U.K., Petitioner obtained British residency as well.[3] (ECF No. 1-5 at 7.)

Soon after their arrival in the United Kingdom, Petitioner enrolled O.I.F. in school at Holmewood House in Tunbridge Wells, Kent. (ECF No. 1-5 at 7.) O.I.F. attended school there from October 2021 until his arrival in the United States in July 2024. (*Id.*) In late 2021, Respondent recovered from his near fatal bout with COVID-19 and came to the United Kingdom. (ECF No. 17 at 7.) Respondent did not live with Petitioner and O.I.F. As presented to the Court, Petitioner was living with her sister, and there was insufficient space for Respondent to move in as well, so Respondent lived with his sister, also in the U.K. (ECF No. 17 at 7.) However, Respondent did see O.I.F. during that time, occasionally driving him to and from school and taking him for weekends. (ECF No. 17 at 8-9.)

In October 2022, Respondent moved from the U.K. to the Philadelphia area. (ECF No. 1-5 at 7.) The parties dispute Respondent's reason for leaving; Petitioner claims that Respondent said

---

[3]     Respondent has made repeated claims that Petitioner obtained British residency by fraudulent means. (ECF No. 17 at 2.) The Court has not considered these claims in its decision-making. The Court does not deem the issue relevant to its decision in this case.

he was leaving to "find himself," while Respondent maintains that he came to Philadelphia for necessary medical treatment for ongoing effects of his COVID-19. (ECF No. 1-5 at 7; ECF No. 17 at 9.) Regardless of the reason for his departure, Respondent was living in Philadelphia, while Petitioner and O.I.F. lived in England.

During the time O.I.F lived in the U.K. with Petitioner, O.I.F. was enrolled in a tuition-based school in the United Kingdom and Respondent was in the United States. The cost associated with and payment for O.I.F.'s schooling was an ongoing issue for Petitioner and Respondent. Text messages reveal that Petitioner regularly asked Respondent for assistance paying O.I.F.'s school fees, which he was unable to pay. Petitioner also sought and received financial assistance from a family friend, who regularly paid O.I.F's tuition and fees to Holmewood House. (*See generally* Respondent's Ex. A, text messages between Petitioner, Respondent, and "Prince Eludoyin.") During this time, Respondent suggested to Petitioner that they enroll O.I.F. in free, public school in Philadelphia. (Respondent's Ex. A at 5.) However, Petitioner and Respondent never came to any agreement to enroll O.I.F. in school in the United States.

Following Respondent's move to the United States, O.I.F. visited his father in Philadelphia on at least two occasions during school breaks. (ECF No. 20, Dec. 16, 2024 Evidentiary Hearing.) Each time, O.I.F. returned to the U.K. at the conclusion of the visit and resumed school at Holmewood House. (*Id.*). On July 6, 2024, O.I.F. flew to Philadelphia for what was originally intended to be a two-week visit with Respondent. (*Id.*) At the time of the visit, Petitioner understood that O.I.F. would be returning to Holmewood School in the fall. (ECF No. 1-5 at 7.) He was registered to take various British school exams the fall of 2024, as well as participate in a class ski trip in February 2025. (*Id.*)

Although O.I.F.'s visit in July 2024 was scheduled to be two weeks long, during his visit the parties agreed that he could remain in Philadelphia for the rest of the summer, and return to the United Kingdom before the start of the new school year in September. (ECF No. 17 at 10.) Respondent asserts that while O.I.F. was with him in the United States, he enrolled him at Wissahickon Middle School in Montgomery County, Pennsylvania, and informed Petitioner, after doing so, that O.I.F. began to attend school there. (*Id.*) Respondent states that Petitioner "asked only that [Respondent] include her name in all the school emails and updates," and that both parents participated in several school conference calls. (*Id.*) Petitioner disputes that she ever consented to O.I.F.'s enrollment in school in the United States. Petitioner stated that prior to the start of the school session in September 2024 in the U.K., she attempted repeatedly to communicate with the Respondent and he was not responsive. (ECF No. 20, Dec. 16, 2024 Evidentiary Hearing.) Both parties agree that at some point early in O.I.F.'s school term in the U.K., Petitioner demanded that O.I.F. be sent back to the United Kingdom. However, despite Petitioner's demand that their son be returned to the U.K., Respondent retained O.I.F. in the United States

While he has been living in Philadelphia, O.I.F. speaks regularly with his mother. Respondent has never limited or interfered with their communication. (CITE.) Occasionally the parties have spoken when O.I.F. is on FaceTime with Petitioner and Respondent happens to be nearby. The parties have also both been on conference calls with the guidance counselor at O.I.F.'s school, Wissahickon Middle School. However, Petitioner and Respondent have never communicated directly about O.I.F., which seemed to be largely due to Respondent's unwillingness to respond to outreach from Petitioner.

Throughout these proceedings, each party has tried to paint the other as ill-intentioned, unstable, and otherwise unfit to parent O.I.F. The Court is not convinced by either side's depiction

of the other parent. Much of the evidence offered has been unsubstantiated or irrelevant. The facts that the Court has laid out above are those that it deems relevant to its decision. Moreover, the Court believes that both parents care about their son and are equipped to parent him. However, that is not the question at issue before the Court. The Court's role in making a determination on this petition under the Convention is to decide only whether a wrongful retention has taken place and, if it has, order O.I.F.'s return to the United Kingdom. It is that jurisdiction's responsibility to address custody and any related issues. *See Baxter v. Baxter*, 423 F.3d 363, 34 n.9 (3d Cir. 2005) (noting that "unsupported allegations between the parties regarding their respective fitness as parents . . . . are normally reserved for a custody proceeding." (citing Hague Convention, art. 19)).

## II.    LEGAL STANDARD

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). The International Child Abduction Remedies Act, which implements the Convention, "permits a parent (or other individual or institution) seeking relief under the Convention to file a petition for return of a child in state or federal court and directs courts to '"decide the[se] case[s] in accordance with the Convention."'" *Golan*, 596 U.S. at 676-77 (quoting 22 U.S.C. § 9003(d)).

"Under the Hague Convention . . ., if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return." *Id*. at 669. This requirement is a "provisional remedy," meant to identify the proper forum for custody proceedings. *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citing Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U. C. D. L. Rev. 1049, 1054 (2005)). "[T]he Convention's core premise that 'the interests of children . . . in matters

relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Id.* (quoting Convention Preamble, Treaty Doc., at 7.)

"Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies." *Golan*, 596 U.S. at 671-72. (citing 22 U.S.C. § 9003(e)(1)). And "[a]bsent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence." *Id*. at 672 (citing 22 U.S.C. § 9001(a)(4)).

## III.    DISCUSSION

### A.  Wrongful Retention Under the Convention

The petitioner bears the initial burden of proving wrongful removal or retention by a preponderance of the evidence. *Karpenko v. Leendertz,* 619 F.3d 259, 263 (3d Cir. 2010) In order to make this *prima facie* showing, the petitioner must show: (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Id.* The Court finds that Petitioner has met her burden of establishing a *prima facie* case of wrongful retention of O.I.F. in the United States.

This is a petition for wrongful retention, not wrongful removal. There is no dispute that both parties consented to O.I.F. traveling to the United States in July 2024. However, there is also no dispute that Petitioner did not consent to O.I.F. remaining in the United States beyond the end of his summer vacation; Respondent conceded this during the evidentiary hearing. (ECF No. 20,

Dec. 16, 2024 Evidentiary Hearing.) Thus, the wrongful retention took place when Respondent failed to send O.I.F. back to the United Kingdom before the start of his school term in the United Kingdom.

Second, the Court finds that the United Kingdom was O.I.F's country of habitual residence at the time of the wrongful retention. Respondent argues that Petitioner brought O.I.F. to the United Kingdom without his consent while he was battling COVID-19, and that the parties had no plans to live in the United Kingdom. However, the Supreme Court is clear that no agreement between parents is required to show habitual residence. *See Monasky*, 589 U.S. at 71. Rather, habitual residence is the place where the child is at home at the time of retention. *Id.* at 77. Regardless of the circumstances under which O.I.F. ended up in the United Kingdom (though in this case, the Court would suggest that Petitioner made a reasonable decision to move to a place where the parties both had family during a challenging time in which Respondent was in a medical crisis battling COVID-19), when O.I.F. went to visit his father in Philadelphia in July 2024, O.I.F's home was in the United Kingdom.

Respondent moved to Philadelphia without O.I.F. with the knowledge that O.I.F. would be living with his mother in the United Kingdom. O.I.F. had repeatedly visited Respondent in the past and, at the conclusion of those visits, returned to his home in the United Kingdom. O.I.F. was enrolled in school and activities in the United Kingdom, and all parties had agreed that he would be returning to the United Kingdom at the conclusion of the July 2024 visit. These facts all indicate that the United Kingdom is O.I.F.'s proper country of habitual residence.

Respondent does not appear to question the third or fourth elements of Petitioner's *prima facie* case, relating to her custody rights under U.K. law. Petitioner must show that Respondent's

retaining O.I.F. breached petitioner's custody rights under U.K. law, and that Petitioner was exercising her custody rights at the time of removal.

"[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Baxter*, 423 F.3d at 368. "If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. *Id*. (internal citations omitted).

The analysis regarding Petitioner's custody of O.I.F. is straightforward. O.I.F. is Petitioner's biological son and has lived with her (primarily alongside Respondent) for his entire life. Nothing in the record indicates that Petitioner had abandoned O.I.F., nor has Respondent made such a suggestion. When Respondent left the United Kingdom in 2022, he understood that he was leaving O.I.F. in the care of Petitioner. After that point, the evidence indicates that Petitioner was entirely responsible for O.I.F., including supporting him financially and that he lived with her when not at his boarding school. Petitioner has never been apart from her son for any extended period of time except during this time the Respondent has retained O.I.F. in the United States.

Having satisfied all four prongs, Petitioner has satisfied her burden of showing a *prima facie* case for wrongful retention under the Convention.

### B. Affirmative Defense to Return

Once the petitioner makes out a *prima facie* showing of wrongful retention, the court must order the child's return, unless the respondent is able to establish one of five affirmative defenses. *McElligott v. McElligott*, No. CV233175RKRLS, 2023 WL 5932947, at *18 (D.N.J. Sept. 12, 2023) (citing *Karpenko*, 619 F.3d at 263). Karpenko, 619 F.3d at 263. "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense

applies, the court has the discretion to order the child's return." *Id.* (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006)).

Respondent has offered evidence that Petitioner has hit O.I.F as a form of punishment or discipline. (*See* Respondent's Ex. B.) The Court construes this evidence as *pro se* Respondent's attempt to offer an affirmative defense under the Convention that returning the child to his habitual residence would place the child in "grave risk [of] . . . physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13(b).

The exception has been applied in instances where a child is at risk of serious abuse or neglect if repatriation occurs, or, alternatively, where the place of habitual residence has been deemed unsafe, for instance, in times of war or famine. *See Godinez v. Morales*, No. CV223596GCDEA, 2023 WL 3727863, at *8 (D.N.J. May 30, 2023); *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003).

However, courts have been reluctant to apply the grave harm exception in cases where the alleged harm is corporal punishment. *See Godinez*, 2023 WL 3727863, at *8 (quoting *Vera Revelo v. Canizalez Cedeno*, Civ. No. 22-01419, 2022 WL 4009699, at *6 (W.D. La. Sept. 2, 2022) ("[S]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk.")); *see also Farr v. Kendrick*, No. CV-19-08127-PCT-DWL, 2019 WL 2568843, at *14 n. 23 (D. Ariz. June 21, 2019). Petitioner denies that she has ever abused O.I.F. (*See* Petitioner's Dec. 23, 2024 Letter to the Court) Even taking as true the allegations that Petitioner has hit O.I.F., the Court does not find that such action rises to the level of grave harm necessary for the affirmative defense to apply.

### C. Costs

Petitioner seeks reimbursement for costs incurred during this proceeding pursuant to Hague Convention Art. 26 and 42 U.S.C. § 11607. ICARA provides that,

> [a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3). Because the Court has ordered the return of O.I.F. to the United Kingdom, the Court is obligated to order that Respondent reimburse Petitioner for necessary expenses incurred by her in filing this petition. However, in reviewing Petitioner's request for reimbursement, the Court finds that some of her requests are not necessary expenses, and therefore, are not required to be reimbursed under the statute.

The Court will not order reimbursement for O.I.F.'s school fees, nor for expenses related to other legal proceedings, meaning any proceeding outside the scope of this petition. Because the Court encouraged Petitioner to appear in person at the November 12, 2024 hearing, expenses for that trip are appropriately reimbursed, however, the Court will order only reimbursement for out of pocket expenses, not for redemption of points, miles, or other non-monetary forms of currency. (*See* Petitioner's Ex. 4(c).) In addition, the Court finds that the manner in which Petitioner has submitted expenses renders them some of them unclear. For example, she has requested reimbursement of $1,831 for hotel costs, however, the receipt for the hotel states that she received a $515.91 refund, rendering the total cost $1,315.03. (*See* Ex. 4(d).) In addition, all the Uber rides are consolidated into one image, making it difficult to see which rides are appropriate for reimbursement. (*See* Ex. 4(e).)

Within fourteen (14) days from the entry of this order, Petitioner is ordered to resubmit those expenses the Court has indicated it will consider for reimbursement. Each individual expense must be separately listed and clearly matched to an attached receipt. Respondent must file any opposition to Petitioner's fee application within fourteen (14) days of Petitioner filing her application for fees. Upon receipt and review, the Court will make a determination as to which expenses are necessary under ICARA and shall be ordered to be paid by the Respondent.

IV.    **CONCLUSION**

For the foregoing reasons, the Petition seeking the return of O.I.F. to the United Kingdom is **GRANTED**. O.I.F. shall immediately return to Petitioner in the United Kingdom or remain there if he is currently in the United Kingdom. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**